* * * * * * * * * * *
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Houser and the briefs and oral arguments before the Full Commission. The appealing party has shown good ground to reconsider the evidence in this matter. Having reconsidered the evidence, the Full Commission affirms in part and reverses in part the Deputy Commissioner's Opinion and Award and enters the following Opinion and Award.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing and in a Pre-Trial Agreement as:
 STIPULATIONS
1. All parties are properly before the North Carolina Industrial Commission, which has jurisdiction over the parties and the subject matter.
2. Defendant-employer has been and remains insured at all times relevant to this proceeding.
3. The underlying workers' compensation claim that is the subject of this action was accepted by defendants pursuant to an Industrial Commission Form 60 and, in accordance with the Form 60 agreement, plaintiff has been paid ongoing weekly total disability benefits at the compensation rate of $450.99 per week, based on an average weekly wage at the time of her injury of $676.46, since May 11, 2001. Prior to May 11, 2001, plaintiff worked part-time for Kennametal but was paid her full salary.
4. The issues pending before the Full Commission are as follows:
 a. whether plaintiff is temporarily totally disabled and entitled to benefits or whether she is permanently and totally disabled and entitled to benefits;
 b. whether plaintiff is permanently partially disabled and entitled to benefits; and
 c. whether plaintiff's treatments from her treating physicians, namely the disputed Botox injections, Rolfing, and psychological counseling, are related to her injuries from the accident of December 22, 2000.
 * * * * * * * * * * *
Based upon the evidence of record and the inferences arising naturally therefrom, the Full Commission enters the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was thirty-four (34) years of age, with her date of birth being November 2, 1968. As for her educational background, plaintiff completed high school and attended community college in Florida for approximately 2 years.
2. Plaintiff's job history includes working for a fast food restaurant and working for a retail business known as the Tile Gallery performing administrative duties. Plaintiff subsequently worked for Columbia Forest Products for approximately 2 years performing administrative duties as an Executive Administrative Assistant, leaving in February 1997.
3. Plaintiff's employment with defendant-employer started in late October or early November 1998, when she began working as an Executive Assistant. Following a period of approximately 4 months, plaintiff was assigned to work as an Executive Assistant to Mr. Henry G. Libby III, then president of Kennametal-Disston and later the operating manager for defendant-employer at its Greensboro location.
4. Approximately one year after beginning her employment with defendant-employer, plaintiff testified that she began receiving a monthly payment of $500.00 directly from Mr. Libby. According to plaintiff, this money was in addition to her regular salary and represented payment for her performance of personal duties outside her regular job duties for Mr. Libby. Plaintiff further testified that these extra payments continued until the end of her employment with defendant-employer, and that over time, the line between her responsibilities to defendant-employer and to Mr. Libby blended such that no distinction was made by Mr. Libby when asking plaintiff to perform certain tasks.
5. On December 22, 2000, while on a business errand for Mr. Libby and defendant-employer, plaintiff was involved in an automobile accident when her vehicle was stuck from behind by another vehicle as she was stopped at an intersection. To paramedics who arrived at the scene, plaintiff reported experiencing back and neck pain as well as a headache. Plaintiff was transported by ambulance to Moses Cone Hospital where she underwent x-rays of her cervical and lumbar spines. Following her examination, plaintiff was diagnosed as having sustained a cervical and lumbar sprain or strain. Plaintiff did not sustain any broken bones, ruptured discs, or lacerations, and required no surgical intervention as a result of her automobile accident.
6. On December 28, 2000, plaintiff reported to the Emergency Room at Wesley Long Hospital. Records from that date indicate that plaintiff reported continuing to experience back and neck pain as well headaches. Plaintiff was then referred to Dr. Anna Voytek, an orthopedic physician, and underwent a CT scan that revealed no abnormalities aside from a mild C5-6 disc bulge. Dr. Voytek explained during her deposition that this mild cervical disc bulge was within normal ranges given plaintiff's age. Plaintiff was diagnosed as having a cervical strain and post-traumatic headaches, for which she was prescribed a neck brace to use as needed.
7. Plaintiff continued treating with Dr. Voytek through January 30, 2001, at which time she was referred to physical therapy. Plaintiff participated in physical therapy from February 1, 2001, through February 16, 2001, but these treatments did not resolve plaintiff's neck pain and headaches. Thereafter, plaintiff was referred to Dr. Albert Bartko for possible occipital nerve injections.
8. Plaintiff also received treatment for her headaches during this period from Dr. Jeffery Schmidt, a neurologist. Dr. Schmidt first examined plaintiff on January 3, 2001, at which time he noted that plaintiff's neck had a limited range of motion, and that she was experiencing pain in her occipital region, her trapezius regions, and her interscapular areas. Dr. Schmidt diagnosed plaintiff as having cervicogenic headaches relating to a whiplash injury.
9. Dr. Bartko first examined plaintiff on March 7, 2001, at which time he identified a trigger point in plaintiff's right lower cervical paraspinal muscles and tenderness over her great occipital nerves at the base of her skull. Dr. Bartko diagnosed plaintiff as having cervical and shoulder myofascial pain syndrome with associated greater occipital neuralgia. Dr. Bartko opined that additional therapy was appropriate and should include a trial of a TENS unit for pain control. Plaintiff was prescribed a hydrocortisone cream for use on her greater occipital nerves and Ultram as a substitute for Vicodin, and referred for occipital nerve block injections.
10. Pursuant to Dr. Bartko's recommendation, plaintiff underwent more than thirty (30) occipital nerve blocks performed by Dr. Mark Philips of Triad Pain Management Center. Dr. Philips has diagnosed plaintiff as having a cervical strain syndrome with post-strain occipital neuralgia.
11. Plaintiff was also referred to Dr. Mitchell J. Bloom, a board certified Physical Medicine Rehabilitation physician. Dr. Bloom first examined plaintiff on April 6, 2001, and noted that she had significant tenderness over her occipital ridges and trigger points in her cervical paraspinal muscles. Based upon her history and his examination, Dr. Bloom diagnosed plaintiff as having a myofascial pain syndrome with occipital neuralgia.
12. On June 1, 2001, plaintiff began receiving chiropractic treatments, but discontinued these after three sessions. Additionally, for the period of July 9, 2001, through May 2002, plaintiff received physical therapy treatments at Integrative Therapies, Inc. upon the referral of Dr. Bartko. These treatments were aimed at alleviating symptoms related to plaintiff's occipital neuralgia and myofascial pain syndrome.
13. Plaintiff returned to Dr. Bloom on August 27, 2001, at which time he noted that she was experiencing depression. For her depression, plaintiff sought treatment from Dr. Walter F. Heiney, Ph.D, a psychologist, who first evaluated plaintiff on August 21, 2001. As for Dr. Bloom, on September 5, 2005, she performed acupuncture treatments on plaintiff that did provide plaintiff with some symptom relief.
14. On September 26, 2001, plaintiff began treatments with Dr. Martha Simpson, Ph.D. Based upon her clinical experience with plaintiff and plaintiff's history, Dr. Simpson diagnosed plaintiff as having an adjustment disorder with anxiety and depression. Dr. Simpson is not of the opinion that plaintiff has post-traumatic stress disorder (PTSD). At her deposition, Dr. Simpson testified that the December 22, 2000, automobile accident caused a loss of a work role for plaintiff, and that such a role was vital for plaintiff. Dr. Simpson also opined that the accident decreased plaintiff's support system and damaged her self-esteem. Additionally, Dr. Simpson believes that the loss of her work, friendships, and financial freedom, along with her ongoing physical problems and medication side-effects, have been detrimental to plaintiff's normal life.
15. As for plaintiff's progression and behavior during the period of her treatments, Dr. Simpson has testified that plaintiff has made progress, though at times it has been erratic. Also, Dr. Simpson had found no evidence of plaintiff engaging in substance abuse, an opinion shared by Dr. Phillips.
16. Regarding plaintiff's ability to earn wages, Dr. Simpson has opined that her inability to work is due to her physical problems and medication side-effects and not her psychological problems.
17. Also on September 26, 2001, plaintiff began treatments with Dr. Carol Richardson, a psychiatrist. Based upon her clinical experience with plaintiff, Dr. Richardson has diagnosed her has having PTSD, myofacial pain syndrome, occipital neuralgia, asthma, and post concussive headache syndrome with migraines. Dr. Richardson's ongoing treatment of plaintiff has consisted of prescribing anti-depressant medications for her depression and anxiety. Dr. Richardson has also prescribed plaintiff multiple other medications to address her sleep problems.
18. On March 7, 2002, plaintiff returned to Dr. Bartko to discuss the possibility of Botox injections as treatment for her headaches, a treatment recommended by Dr. Schmidt and Dr. Phillips. Dr. Bartko has indicated that, although he was aware of positive cases studies involving Botox treatments, this treatment had not been sufficiently reviewed in a well-done controlled study. Accordingly, Dr. Bartko informed plaintiff that further investigation by her of this proposed treatment was reasonable, but that he had nothing further to offer her medically.
19. On March 10, 2004, Dr. Catherine A. Weymann, a board certified neurologist, replaced Dr. Schmidt as a treating physician when he moved from the area to Charlotte. Contrary to Dr. Schmidt's opinion, Dr. Weymann has opined that plaintiff's pain syndrome is significantly out of proportion to the objective results of her diagnostic studies.
20. Prior to moving to Charlotte, Dr. Schmidt referred plaintiff for an evaluation by Dr. B. Todd Troost, a Neurologist and then Professor and Chairman of the Department of Neurology, Bowman Gray School of Medicine. Dr. Troost first examined plaintiff on March 20, 2002, and identified specific trigger point areas in the right side of plaintiff's neck and occipital area that radiated into her right shoulder and into her right rhomboid, the muscle arising from the lower cervical spine. Based upon a medical study regarding headaches that was presented at the 2003 meeting of the American Academy of Neurology, Dr. Troost has recommended Botox injections for plaintiff. Although this type of treatment was not approved by defendants, plaintiff began receiving Botox injections from Dr. Troost on September 5, 2002. Plaintiff continued to receive Botox injections through April 6, 2004, for which she has directly paid $13,284.43.
21. On August 5, 2004, upon the referral of Dr. Troost, plaintiff was examined by Dr. Francis X. Walsh, a neurologist. Dr. Walsh has diagnosed plaintiff as having chronic headaches and cervical muscle spasms for which he has primarily treated her with prescriptions medications. As recently as January 5, 2005, Dr. Walsh added the narcotic Methadone to plaintiff's medication regime.
22. At defendants' request, plaintiff underwent an independent medical examination conducted by Dr. Robert W. Irwin, a neurologist. Dr. Irwin diagnosed plaintiff as having severe fibromyalgia for which he recommended that she receive ongoing treatments by an appropriate medical professional. Dr. Irwin also opined that, given the severity of her condition, non-traditional treatments such as Botox injections and Rolfing might be helpful. Plaintiff contends that Rolfing treatments, which are described by The Rolf® Institute of Structural Integration as a "holistic treatment" which "focuses on health maintenance and personal evolution" by "organizing the body in gravity," should be provided by defendants.
23. Also upon the referral of defendants, plaintiff has been evaluated by Dr. Verne G. Schmickley, a forensic psychologist with more than thirty (30) years of experience evaluating and treating patients with musculoskeletal problems. Dr. Schmickley diagnosed plaintiff as having a conversion disorder, which is a sub-class of undifferentiated somatoform disorder. Dr. Schmickley described a somatoform disorder as a condition whereby the patient, because of internal psychological coping deficiencies, has difficulty expressing emotional problems and, therefore, subconsciously manifests those emotional problems through physical symptoms even though there is no underlying physical condition which would otherwise cause such symptoms. On the issue of causation, Dr. Schmickley has testified to a reasonable degree of psychological probability that plaintiff's somatoform condition was not caused, aggravated, or accelerated by the December 22, 2000, automobile accident.
24. Upon the request of defendants, Dr. Jeffrey Siegel, non-board-certified neurologist, reviewed plaintiff's medical records. Based upon that review, Dr. Siegel opined that plaintiff was malingering and did not sustain the type or extent of injuries that she has asserted.
25. According to plaintiff, her Botox injections have provided her with temporary relief from her neck pain, although they did not relieve the headaches which are the primary source of her disability. Plaintiff testified that the only treatment which has significantly alleviated her headaches was narcotic pain medication. Dr. Bartko has testified that based upon his understanding of plaintiff's medical records, the Botox injections have not been effective and he would not recommend continuing with that form of treatment. Additionally, as of the date of the hearing before the Deputy Commissioner, the United States Food and Drug Administration has not approved Botox for use in the manner in which it has been administered to plaintiff. Nonetheless, Dr. Schmidt has testified that, overall, plaintiff seemed to gain significant relief from her Botox injections, at least in regard to her ongoing neck pain.
26. Plaintiff has also periodically reported to physicians that Rolfing has provided temporary relief of her neck pain. However, these subjective reports of success are given little weight by the Full Commission since plaintiff would often complain during the same appointment of worsening pain, headaches, and depression. In addition, Dr. Schmidt testified that, although he had initially agreed with plaintiff that she should try Rolfing therapy, plaintiff's Rolfing treatments failed to provide plaintiff with any significant or lasting pain relief.
27. Dr. Richardson, plaintiff's treating psychiatrist, has testified that, during the period of plaintiff's participation in psychotherapy, her mental health has actually deteriorated. Dr. Schmickley has a similar opinion, noting that plaintiff's has experienced no appreciable improvement in her psychological condition during the period of her treatment, and opining that her current treatments should be discontinued.
28. Dr. Schmickley and Dr. Bartko have opined that plaintiff is within the class of patients for whom multiple medical interventions and protracted treatment actually increases the patient's psychological perception of pain, disability, and need for ongoing medical treatment. Specifically as to plaintiff, continuing to provide her with ineffective medical treatment is likely to adversely affect her through the subconscious perpetuation and manifestation of physical symptoms.
29. Of plaintiff's physicians, more weight is given by the Full Commission to the opinions of Dr. Schmidt, Dr. Irwin, Dr. Simpson, and Dr. Richardson regarding the conditions and treatments at issue in this case.
30. The Full Commission finds that the Botox injections and Rolfing treatments plaintiff has received were duly prescribed by competent physicians in the anticipation that they would effect a cure, provide relief, or shorten the period of plaintiff's disability. Accordingly, the record supports holding defendants financially responsible for such past treatments.
31. Based upon the totality of the credible lay and medical evidence of record, the Botox injections plaintiff has received have provided relief for plaintiff's ongoing neck pain. Accordingly, the record supports holding defendants financially responsible for continued Botox treatments.
32. Based upon the totality of the credible lay and medical evidence of record, the Rolfing treatments plaintiff has received have not effected a cure, provided relief, or shortened the period of her disability. Accordingly, the record does not support holding defendants financially responsible for continued Rolfing treatments.
33. As early as August 27, 2001, plaintiff was reporting symptoms of depression to her physicians stemming from her injury. Since that date, plaintiff's psychological profile has become considerably more complicated to the point where particular psychological components cannot be definitively linked causally to, or excluded from having a connection with, her December 22, 2000, automobile accident. Accordingly, though there is credible evidence of record regarding the lack of progress or even worsening of plaintiff's mental and emotional condition during the period of her psychological treatment, due to the overlaid and intertwined nature of her problems and conditions, the Full Commission finds that continued psychological treatment is warranted and reasonable. However, this finding does not prevent the parties from pursuing new courses of treatment with alternate psychological professionals.
34. Based upon the credible medical and lay evidence of record, and considering plaintiff's age and educational background, she is not permanently and totally disabled.
35. There is insufficient evidence of record upon which to find that plaintiff has sustained any degree of permanent partially disability.
36. At present, there is insufficient evidence of record upon which to modify plaintiff's compensation rate by recalculating her average weekly wage with the inclusion of any payments by Mr. Libby directly to plaintiff.
 * * * * * * * * * * *
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. On December 22, 2000, plaintiff sustained an injury by accident arising out of and in the course of her employment with defendant-employer. N.C. Gen. Stat. § 97-2(6).
2. As the direct and natural result of, and causally related to, her December 22, 2000, injury by accident, plaintiff began experiencing symptoms of depression. Id.
3. Because, since the development of her depression, plaintiff's psychological profile has become extremely more complicated, now involving overlaid and intertwined components, the Full Commission concludes that that continued psychological treatment is warranted and reasonable. N.C. Gen. Stat. §§ 97-25;97-25.1. This conclusion of law does not prevent the parties from pursuing new courses of treatment with alternate psychological professionals. Id. Plaintiff is also entitled to have defendants pay for future related treatment associated with her cervical condition and chronic headaches. Id.
4. Because the Botox injections plaintiff has received have provided and continue to provide significant relief for plaintiff's neck pain, the Full Commission concludes that that continued Botox treatment is warranted and reasonable. Accordingly, plaintiff is entitled to have defendants pay for plaintiff's Botox treatments. N.C. Gen. Stat. §§ 97-2(19); 97-25;97-25.1.
5. Because the Rolfing treatments plaintiff has received have not effected a cure, provided relief, or shortened the period of her disability, plaintiff is not entitled to have defendants pay for continued Rolfing treatments. N.C. Gen. Stat. §§ 97-2(19);97-25. Nonetheless, because said treatments were properly prescribed in the hope and expectation of effecting a cure, providing relief, or shortening the period of plaintiff's disability, plaintiff is entitled to have defendants pay for Rolfing treatments received by plaintiff prior to the date of the hearing before the Deputy Commissioner. Id.
6. Pursuant to the Industrial Commission Form 60 filed by defendants, plaintiff remains entitled to receive from defendants ongoing total disability benefits at the rate of $450.99 per week until such time as plaintiff returns to work or further Order of the Commission. N.C. Gen. Stat. § 97-29.
7. Based upon the credible medical and lay evidence of record, and considering plaintiff's age and educational background, the Full Commission concludes that plaintiff is not permanently and totally disabled. Id.
8. There is insufficient evidence of record upon which to conclude that plaintiff has sustained any degree of permanent partially disability. N.C. Gen. Stat. § 97-31.
9. At present, there is insufficient evidence of record upon which to modify plaintiff's compensation rate by recalculating her average weekly wage with the inclusion of any payments by Mr. Libby directly to plaintiff. N.C. Gen. Stat. § 97-2(5).
 * * * * * * * * * * *
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Defendants shall continue paying to plaintiff ongoing total disability benefits at the rate of $450.99 per week until such time as she returns to work or further Order of the Commission.
2. As the result of her December 22, 2000, injury by accident, plaintiff is entitled to have defendants pay for, and defendants shall pay for, past and future related treatment associated with her cervical condition and chronic headaches, including past Rolfing treatments and past and continuing Botox treatments, and for expenses incurred or to be incurred related to her psychological treatment, including expenses from treatment provided by Dr. Richardson and Dr. Simpson. Defendants are not required to pay for any Rolfing treatments received by plaintiff following the date of the hearing before the Deputy Commissioner.
3. This case is hereby referred to the Nurses' Section of the Industrial Commission for selection of a physician to evaluate plaintiff for possible detoxification and change of plaintiff's drug regiment. Defendants shall pay for said evaluation.
4. The Full Commission hereby re-opens the record of evidence for a period of ninety (90) days from the date of filing of this Opinion and Award to receive further evidence from the parties concerning whether plaintiff's average weekly wage should be recalculated with the inclusion of any payments by Mr. Libby directly to plaintiff. The parties shall submit any documentary evidence, affidavits, or deposition testimony relating to this matter directly to the Full Commission within said period of time.
5. Defendants shall pay the costs.
This eighth day of June, 2006.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
DISSENTING:
 S/____________ BUCK LATTIMORE CHAIRMAN